[Crim. No. 7253. Second Dist., Div. Three. June 26, 1961.]

THE PEOPLE, Respondent, v. SAM LO CIGNO, Appellant.

*Assigned by Chairman of Judicial Council.

Paul Augustine, Jr., and Russell E. Parsons for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

SHINN, P. J.—Sam Lo Cigno, indicted for the murder of Jack Whalen, also known as Jack O'Hara, was convicted by verdict and judgment of murder of the first degree; his motion for new trial was denied, he was sentenced to state prison for life and he appeals from the judgment and the order denying his motion for a new trial.

The homicide took place December 2, 1959, shortly before midnight, in a restaurant known as Rondelli's in the San Fernando Valley in Los Angeles County. The killing was accomplished with a .38 caliber revolver in the hands of defendant. The surrounding circumstances were witnessed by a number of persons, patrons of the cafe, who were called as witnesses and gave testimony of what they had observed. Although some apparently saw more than others, upon the main features of the occurrence their versions were substantially the same. Along the north, east and west walls of the room were booths with tables. There were four tables midway between the easterly tables and the center of the room. One of these was table 15. In the center of the room there were two tables, adjoining which was a planter box, then cocktail tables and beyond that a bar. Many patrons were in the room, a number of whom gave testimony, namely, Roger Leonard, Robert "Rocky" Lombardi, Harry Diamond, Toni Ross and her husband Michael, Jack Gotch, Claretta Hashagen, also known as Sandy Hagen, Michael "Mickey" Cohen, Joe Friedman, also known as Joe Mars, Jo Wyatt, Ona Rae Rogers, George G. Piscitelle, also known as George Perry, and Anthony Amereno, also known as Tony Reno.

The following is a brief description of the shooting of O'Hara. At about 11:40 p.m., at table 15 were seated Lo Cigno, Piscitelle, Roger Leonard, Joe Di Carlo, Claretta Hashagen and Mickey Cohen. O'Hara entered the restaurant through a door leading from the kitchen. He walked through the bar area and came to a phone booth where Amereno was making a call. Earlier that day, Amereno had talked with O'Hara by phone, O'Hara had made threats against Piscitelle and Lo Cigno regarding a gambling debt and Amereno had spoken in favor of Piscitelle and Lo Cigno. O'Hara pulled Amereno out of the phone booth and shoved him toward the dining room area, asking "Where's them friends of yours, them two Dagos? ... Where are those two Dago bastards? They're going to go. Are they in there?" and Amereno replied "Yes, in the back." O'Hara then shoved Amereno into the dining room area. Amereno went back to the end of the bar, where he remained.

O'Hara went to table 15, where Piscitelle was seated, put his left hand on the right shoulder of Piscitelle and asked the latter if he had something to talk to him about. Piscitelle replied "I don't have anything to talk to you about, Jack." O'Hara was described as being "very, very angry." He hit Piscitelle in the mouth, knocked him off the chair and to the floor. O'Hara took hold of a chair; there was testimony that he raised it off the floor and also that he made a move across the table toward Lo Cigno and said "You're next, you Dago bastard." Lo Cigno fired two shots. One went into the ceiling and the other struck O'Hara in the forehead, causing his death. Lo Cigno left, remained in hiding for several days, surrendered to the police and stated that he had shot O'Hara in self-defense.

In a trashcan in the rear of a building adjoining the restaurant the police found a cellophane bag containing three .38 loaded revolvers. None of these had been fired and none was traced to defendant, or any of the persons present at the time of the shooting. All were introduced in evidence over objection of defendant, as will be explained.

The grounds of appeal are (1) claims of misconduct on the part of the district attorney's deputies in 13 specified instances; (2) error in the admission of the guns in evidence; (3) improper statements made by the court to the jury with respect to the good faith of the prosecutor in conducting improper cross-examination; (4) error in instructing the jury with respect to the burden of going forward with proof of self-defense; (5) failure of the court to advise the jury to acquit; (6) failure of the court to give of its own motion an instruction on manslaughter; (7) insufficiency of the evidence to prove the offense of first degree murder and (8) failure of the court to reduce the offense to manslaughter.

It is conceded in defendant's brief that the evidence was sufficient to support a conviction of voluntary manslaughter, and it is contended that if the judgment is not reversed, it should be modified to voluntary manslaughter.

The circumstances of the killing were described in greater detail in the testimony of defendant and his witnesses. There was a wealth of evidence and, in fact, it was expressly admitted by the People, that O'Hara was a bookmaker and "muscleman," and that he specialized in collecting gambling debts by means of threats and violent and brutal assaults upon his victims. He was 6 feet tall and weighed 230 pounds. There was evidence that he claimed Piscitelle and Lo Cigno

owed one Al Levitt $900 on a gambling debt, which he was determined to collect for Levitt.

Robert Lombardi testified that he and one Herrera preceded O'Hara to Rondelli's. They had been making a round of bars and from 8:30 on O'Hara had had 10 or 15 drinks. He asked Lombardi if he knew Perry (Piscitelle) and Lo Cigno, saying they owed him $900 and he was going to collect it; he knew they "hung out" at Rondelli's. O'Hara asked him to go along to protect him from the back as he could take care of anything in front, himself; O'Hara was a collector of gambling debts; he had never known him to carry a gun or knife, but he had seen him use his fists.

George Piscitelle testified that prior to December 2 he had related to defendant several instances in which O'Hara had brutally beaten several men. He and defendant were placing bets with a bookmaker who was working for Al Levitt. He was familiar with defendant's physical condition, knowing that he suffered from stomach trouble, required special food, and was still suffering from the effects of an automobile accident. On December 2 he was living with Anthony Amereno (Tony Reno) and defendant was living with Joe Di Carlo. He told Lo Cigno that on the morning of December 2, O'Hara called him and, among other threats, told him that he and defendant owed $900 and if they didn't pay that he was going "to bust their heads and kill them," all the while "yelling in a belligerent voice." Lo Cigno asked "What am I going to do"; Piscitelle and Lo Cigno were greatly frightened and they remained in their apartment until they went with Di Carlo to Rondelli's for dinner.

Tony Reno testified that he was staying at Piscitelle's apartment. In addition to the telephone booth episode at Rondelli's he testified that O'Hara called by phone and talked with Piscitelle. One John Petiva called Reno and they met at a hotel on Sunset Boulevard to discuss O'Hara's demands. Petiva told Reno of a conversation he had had with O'Hara. Reno and Piscitelle went to defendant's apartment. Reno related to Piscitelle and Lo Cigno his conversations with Petiva who had told him that O'Hara had talked with him and was "very hot at these two guys" (Piscitelle and Lo Cigno) and called them vile names. Reno also reported that Petiva had called O'Hara and had put Reno on the phone, and that he had told O'Hara that "they didn't have the money right now," and O'Hara replied that he didn't care what happened he was going to

get them both "They have both got to go"; Reno told Lo Cigno "You're in for a lot of trouble, like he said. I don't know what you're going to do. He is going to bust you all up; he is going out of his mind."

Michael Rizzo testified that he and defendant had formerly lived in the same apartment the preceding summer. He had related to Lo Cigno an experience that he had had with O'Hara. He told Lo Cigno that O'Hara had come to the apartment, had sat down and appeared quite friendly, asked how Rizzo felt, knowing that he had had a couple of heart attacks, and asked "How you been doing?" and then said "You're going to be with me. . . . Whatever you do, it don't make any difference what you do, you're with me now." He struck Rizzo on the eye leaving a big scar and struck him on the nose, eyes and lips, cursing him and saying "I'm going to kill you." O'Hara demanded money and looked through the apartment, saying that he would be back for $300.

Defendant testified that he was 37 years old, 5 feet 8½ inches in height, weighed 150 or 155 pounds and had received a medical discharge from the army for a condition which required him to maintain a special diet. He was suffering from injuries received in an automobile accident. His former apartment had been broken into and torn up; the following week he bought a loaded gun from Willie Ginsberg for $35, which he kept in the glove compartment of his car. He and Piscitelle had placed a football bet with Al Levitt and had won $390; they had received $140 and they were still owed $250. He did not know O'Hara, had never talked with him or placed a bet with him. He did not owe O'Hara or Levitt any money. He testified to Rizzo's account of his meeting with O'Hara and to his conversations with Piscitelle and Reno, in which they related to him their conversations with O'Hara, and the conversation with Petiva. Di Carlo had planned to have dinner at Rondelli's and defendant decided to go along "as long as he was going to be in a public place." He had no idea that O'Hara would be there. When they arrived he took the gun from the glove compartment of the car and placed it in his pocket. He knew O'Hara's reputation and had been told that he had knocked out a police officer with a single blow and cracked the officer's head. A year and a half before, a bartender had told him that O'Hara had put the owner of the bar up against a wall and beaten him until he said "give him all the money in the register before he kills me." He

was "terrified," "petrified," at the thought of O'Hara's threats. He witnessed the assault upon Piscitelle in the restaurant. O'Hara looked at him, started to lunge and said "Now, you Dago bastard, I'm going to kill you." He did not recall what happened to his gun. After the shooting and before he turned himself in to the police, he was frightened at the thought of what O'Hara's friends or family might do. His physical condition was poor. While in the service he had been in a hospital for 90 days and after his discharge was in the Veterans Administration Hospital in Ohio for about a year. He had to be careful of his diet. As a result of an automobile accident he suffered from injuries to his neck, right arm and chest, for which he was receiving treatment. He had been in California since 1944, had been working for an asphalt company and was expecting to go to work as a bartender. He frequently took his meals at Rondelli's, where he received special foods. He occasionally placed football bets but seldom bet on horses. He recounted the conversation in which Rizzo had related to him his encounter with O'Hara and described Rizzo's condition after he had been beaten "it was an awful sight." He had been told by Piscitelle that the latter had had a talk with Al Levitt, who claimed that Piscitelle owed him $900, while Piscitelle was claiming that Levitt owed him a balance of $250 and Levitt had said: "Well, look, I am through with the thing. I am having J. O. call you. Do you know who J. O. is? Well, that's Jack O'Hara." Levitt said O.K. and about five minutes later O'Hara called and uttered the threats that have been previously described. He had no doubt that O'Hara would carry out his threats. On December 2 he did not drink any alcoholic beverage.

Michael "Mickey" Cohen was one of the witnesses for defendant. He is a character well known to the police. We may assume that the jurors in the course of the trial had learned enough about Mickey Cohen to be able to classify him as a notorious ex-mobster and racketeer. His unsavory reputation was harped upon by the People as the most potent evidence that the killing of O'Hara was premeditated. In the brief of the attorney general it is said: "Mickey Cohen is a notorious figure and there is appellate authority to that effect. (*Cohen* v. *Superior Court*, 173 Cal.App.2d 61, 71 [343 P.2d 286].) If it is of any help to the court, we add to it our representation that Cohen was probably known to the jury as well as to our Appellate Courts," and further "If we

accept appellant's theory [the bad reputation of Cohen] then it becomes the thing for the 'bad man' to do, when he is planning a murder, to associate himself with a notorious gangster and carry out the killing when he is beside him.''

The case we are reviewing could truly be called ''The trial of Mickey Cohen.'' The company defendant was in at Rondelli's characterized him as an associate of criminal elements. There was little reason to doubt that the three loaded guns that were found in the trashcan had been deposited there by associates of Mickey Cohen. There was no evidence that defendant had made an arrangement to meet Cohen or any of his friends at Rondelli's, although it was a restaurant they frequently patronized. There was no evidence that defendant knew O'Hara, had ever met him or held any grievance against him. There was nothing in their relations except O'Hara's declared intention of collecting $900 from Piscitelle and defendant for Levitt, and a denial of defendant and Piscitelle that they owed the money or any part of it. They had no claim against O'Hara, but they did claim that Levitt owed them $250.

We are of the opinion that the killing of O'Hara was not proved to be murder of the first degree.

Murder is the unlawful killing of a human being, with malice aforethought. (Pen. Code, § 187.) ''All murder which is perpetrated by means of poison or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing . . . is murder of the first degree; and all other kinds of murders are of the second degree.'' (Pen. Code, § 189.)

In order to support a finding that the killing was murder of the first degree, substantial evidence would have been required that defendant deliberately formed and held an intention to shoot and kill O'Hara when they should meet. Such an intention would have supplied the element of malice, namely, the deliberate intention to unlawfully take away life of a fellow creature (Pen. Code, § 188), and the element of premeditation.

The evidence, both direct and circumstantial, indicated that defendant was on the defensive, that he was not only not looking for O'Hara, but that he had an intense desire to avoid an encounter with him.

There was no evidence of any statement by defendant of his intentions toward O'Hara and nothing in the circumstances of the shooting which tended to prove that the slaying of O'Hara was a premeditated act.

The law with respect to the elements of murder of the first degree and the duty of a reviewing court to determine whether a finding of first degree murder has substantial support in the evidence was laid down in the cases of *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21] and *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8]. In neither of these cases was the murder committed by means of poison or lying in wait or torture. In each case the judgment of conviction of first degree murder was modified to murder of the second degree for insufficiency of the evidence to show that the murder was committed by "any other kind of wilful, deliberate, and premeditated killing." In *People* v. *Tubby,* 34 Cal.2d 72 [207 P.2d 51], the judgment was modified by reducing the degree of the crime from murder of the first degree to murder of the second degree, the reason therefor being that there was not substantial evidence that the killing was committed by means of torture.

Considering first the question whether the killing of O'Hara was "by means of wilful, deliberate, and premeditated killing, other than by poison or lying in wait or torture," we are compelled to conclude that the evidence was insufficient to prove a killing of that type. Premeditation necessarily exists where the killing is by means of poison, lying in wait or torture. With respect to a killing by other means, we are convinced that there was less evidence of premeditation on the part of Lo Cigno than was shown in either of the Holt or Bender cases. In fact, no evidence was produced by the People which tended to prove premeditation except through tenuous circumstances which the People relied upon to prove the existence of a conspiracy between Lo Cigno and Cohen, and perhaps others, in pursuit of which several friends of Cohen, including defendant, armed themselves and, expecting O'Hara to appear, lay in wait for him. We are further convinced that there was no substantial evidence of the existence of such a conspiracy and no substantial evidence that the killing of O'Hara was in any other manner, or at all, premeditated by Lo Cigno. In reaching these conclusions we have been guided by the statement of the court in *People* v. *Bender, supra,* 27 Cal.2d 164, 186: " 'But as is true as to all factual issues resolved by a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. To the extent that the character of a particular homicide is established by the facts in evidence the jury is bound, as we are, to apply

the standards fixed by law. "The discretion of jurors in considering the effect of evidence as proof is not absolute. It is their duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion." [Citation.]' (*People* v. *Holt* (1944), *supra*, 25 Cal.2d 59, 90.) Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof. An inference must be 'warranted by a consideration of the usual propensities or passions of men, [or] the particular propensities or passions of the person whose act is in question. . . .' (Code Civ. Proc., § 1960.)"

It has been the theory of the People throughout that defendant was lying in wait for O'Hara. There was an undisguised effort to link defendant and Cohen together in a purpose to get rid of O'Hara. It was made clear that the People regarded it as significant that defendant was seated beside Cohen at the table. In an opening statement it was asserted that the bullets came from next to where Cohen was seated. There was persistent effort of the deputies to make Cohen the central figure in the trial. Numerous instances of these efforts will be discussed.

We shall first consider an occurrence during Cohen's cross-examination which unquestionably requires reversal of the judgment. Cohen had testified that to the best of his recollection he had never seen O'Hara before the night of December 2, did not recognize him, nor speak with him. In the cross-examination, the following occurred: "(Mr. Ford) Q. At any time that evening did you say the words 'Now, Sam, now?' A. How can you ask a man that question when it is absolutely false. That's absolutely false and you know it. Q. I am asking you. Answer yes or no. A. You know it is false. Q. Did you say the words, 'Now, Sam, now?' A. That's absolutely untrue. Q. May we have a direct answer, yes or no? THE COURT: In other words, is the answer that you did not say it? THE WITNESS: I did not say it, sir."

When the question was asked whether Cohen had made the remark, no objection was interposed. This is understandable. The attorneys for defendant assumed, and the court stated that it also assumed, at the time, that the district attorney was prepared to present evidence that Cohen had made the remark. It was not until a later stage of the case, when the People had rested without offering any evidence that Cohen had made the remark, that defense counsel made the following motion: "MR. STRONG: At this time, your Honor, I move

to have stricken from the record page 617 and 618, and I say [cite] the District Attorney for misconduct, for prejudicial misconduct, for having asked the question. I ask the court to instruct the jury to disregard any implication in the asking of the questions. . . . MR. FORD: Now just a minute. This shouldn't be discussed in front of the jury. THE COURT: I think that is correct. I think, ladies and gentlemen, you better retire to the jury room for a few minutes while we discuss this matter.'' The jury retired and the following proceedings were had: ''(The following proceedings were had in open court outside the presence and hearing of the jury:) ''THE COURT: Go ahead. MR. STRONG: Yes, your Honor. The specific questions, your Honor, created a very damaging type of implication, and the prosecutor, of course, has offered no evidence to show that the statements were made, the statements specifically being to Mr. Cohen, 'At any time did you say the words, ''Now, Sam, now?'' ' I think those words in themselves created a very damaging type of implication, and I say to your Honor the Prosecutor has no right to ask them unless he had a witness to put on the stand and did put him on the stand to contradict it. MR. FORD: Are you done? MR. STRONG: Yes. MR. FORD: I will say first of all, your Honor, I have never heard of any authority for the proposition stated by counsel. On cross examination of a witness, it seems to me it is entirely proper to ask any questions which may shed light on the case even without any particular basis to do so, and I certainly don't know of any case standing for the principle counsel cited. However, I think that if the Court wishes to have a showing of good faith with respect to that, we may make such a showing, but before going into it, I would make this comment: The showing we would make would to some extent involve a confidential informant, which is something naturally that we don't want to do if we can avoid it. I would suggest this, that if the subject matter be considered of sufficient importance to inquire into that the inquiry be made after the ultimate verdict in the case is returned by the jury. If there is a conviction, if counsel makes a motion for a new trial, and if the Court feels at that time that some show of good faith should be made for the statements, we are prepared to make one, but I would suggest at this point, prior to the verdict in this case, that it would be ill-advised to proceed into it at this time. MR. BUSCH: May I state to your Honor, this was cross examination of a witness in the course of a trial about what happened at a particular

time and place. THE COURT: I know what it was. MR. BUSCH: I say it was proper cross examination to go into what may or may not have been said, and in a cross examination situation we can put the leading question to the witness, 'Did such a thing happen,' and I don't see how counsel can construe such to be misconduct. MR. STRONG: I don't think a prosecutor can ask a question like that unless he is prepared to go forth to prove the opposite of it and does so at the trial. THE COURT: Do you want to inquire into the propriety of it at this time as suggested by you, or do you want to wait until determination of the case as suggested by Mr. Ford? MR. STRONG: I have made my motion, your Honor. THE COURT: Well, Mr. Ford, that places the responsibility squarely upon the Court's shoulders. I will say very frankly, I believe that some avowal of good faith should be made in the matter before the Court rules on this motion. MR. FORD: May I suggest that it be made in chambers outside the hearing of the general public? THE COURT: All right, we'll do that. Do you want the defendant there? MR. STRONG: No objection. MR. FORD: If a demand is made that he be there, I suppose he may have a right to be there. THE COURT: Mr. Strong, the Court will not order the defendant there unless a demand be made that he be there. MR. STRONG: It isn't necessary. THE COURT: All right. (The following proceedings took place in chambers:) THE COURT: We are on the record now. We are convened in chambers in the absence of the defendant and in the absence of the jury to discuss the matters which we started to discuss in open court, and the suggestion was made that the inquiry that the Court suggested was necessary before ruling upon the motion of the defense to strike this particular part of the transcript and to cite the District Attorney and so forth could be made. MR. FORD: I will make the statement for the record at this time again, to clarify our position, as stated by Mr. Busch, that we don't feel that on cross examination you have to be justified, but that in this particular question, that question was based on information to the effect that Mr. Mickey Cohen had in fact said the words, 'Now, Sam, now,' to Mr. Lo Cigno just prior to the time the shots were fired. That information came from the investigator in the District Attorney's Office who, as I understand it—this information comes to me through Mr. Busch—who as I understand it had a conversation with an informant who was a prostitute who received this information from Phil Packer who is known to us and the investigation in this case to be a

close confidant of Mickey Cohen and who was in fact the purported maidre d' at Rondelli's and was in fact present at the time the killing occurred. Now, as to any further details I will ask Mr. Busch to make a statement. MR. BUSCH: Based upon that, I feel that we had a proper right to make that inquiry of Mr. Cohen when he was on the witness stand. They say we did it in bad faith. It wasn't something we just asked for the purposes of embarrassment, but because of certain information that had been related to us in this particular form. That is the basis that we put it upon. THE COURT: Well, what is your reaction to that, Mr. Strong? MR. STRONG: I think that our motion should be granted, your Honor, and the jury should be instructed to disregard the testimony, the question, rather, and any implications that it may have carried. MR. FORD: The question doesn't carry any implication, to start with. MR. STRONG: I think it does. MR. FORD: A jury is instructed in general that the question carries no implication, and they are to draw no inference therefrom. MR. SUGARMAN: I would like to be heard on that. I don't say much because I don't learn much when I'm talking. THE COURT: Go ahead. MR. SUGARMAN: It seems to me the mere asking of the question, 'Did you say,' meaning Mr. Cohen, say, 'Now, Sam, now,' I think carries with it great implication, and certainly is prejudicial to the defendant here, and it lends credence to a theory that they have tried to advance earlier that this was some type of conspiracy, without having the courage of their conviction of charging a conspiracy—and I don't mean by that either Mr. Ford or Mr. Busch—I think it is highly prejudicial in that the jury could draw an inference from it that this was in fact said. I think an instruction to the jury to disregard it would certainly perhaps rectify any prejudicial wrongdoing that there may have been, and it can certainly not hurt the People's case if it is withdrawn because no evidence has ever come forward that this was in fact said. MR. FORD: With respect to what counsel said about the charges made by the Grand Jury in this County, when they charge the crime of murder, the charge of murder of course carries within its purview that the man committed murder pursuant to a conspiracy. Counsel talks about the courage to charge. I am not the Grand Jury of this County. MR. SUGARMAN: I thought I excluded you and Mr. Busch. THE COURT: My reaction to this, gentlemen, is just this, that I believe that the Court could and should find that the question was asked in good faith, but that it not

having been followed up any further than it was, that the Court should instruct the jury to disregard it. MR. FORD: *Well, of course, the only comment I have on that is that disregarding the question seems to be rather difficult.* THE COURT: Disregarding the question and answer. In other words, as I see it, *the inquiry that we have conducted here leads me to believe as a court that it was asked in good faith, but you are in such a position that you could not prove it.* MR. FORD: That is true. THE COURT: *That is the point, but you did ask the question in good faith.* I am not going to grant your motion, Mr. Strong, to censure the District Attorney. MR. BUSCH: We didn't make that up. THE COURT: No, no. That is what the Court is intending to be finding here. The Court will grant the motion to strike the question contained, the questions and answers from line 23, page 617, down to and including line 9 of page 618. Do you want to check that? MR. STRONG: Yes. MR. SUGARMAN: Your Honor, if I may say—THE COURT: Let him check that. MR. SUGARMAN: This isn't with respect to what is contained there. It is simply a motion that you also admonish the jury—THE COURT: To disregard it. MR. SUGARMAN:—disregard it and not draw any implication or inference from anything that they could have. THE COURT: Of course, that comes in the general instruction, Mr. Sugarman, that anything stricken from the record, they are not to draw any inferences from it. MR. SUGARMAN: I realize that. This is a rather peculiar situation. MR. FORD: Counsel has made a rather violent charge in the presence and hearing of the jury, and if the Court tells the jury to disregard it without going further, it is going to have the effect in the jury's mind of substantiating what counsel has said in the minds of the jury, which I don't think is fair to the prosecution. THE COURT: Well, I think the Court will make the statement that the question was asked in good faith. MR. FORD: If that is included in the statement. THE COURT: Oh, yes; that is what I am going to find. Oh, yes. In other words, just down to line 9, Mr. Strong, the entire colloquy between Mr. Ford and Mr. Cohen on that subject is ordered stricken. MR. STRONG: Except we object to your finding of good faith, your Honor. THE COURT: The record will show your objection, and I have nothing further. Let's call the jury down in 15 minutes. . . . THE COURT: Let the record show that the defendant is in court with counsel, the District Attorney is present and the jurors are present and

in their places, together with the alternate jurors. There is before the Court the matter of the motion to strike the testimony contained on page 617, line 23 to 618, line 4. Certain charges have been made against the prosecution in this matter which are a matter of record and the court has conducted an inquiry in the matter outside of the presence of the jury. For the purpose of the record in this matter, the Court rules at this time that the questions asked at lines 23 and 24 of page 617 and line 4, page 618, were asked by the District Attorney in good faith *but that because of circumstances beyond their control they are unable at this time to follow through.* However, the Court does grant at this time the motion of the defense to strike from the record the testimony indicated and, in addition thereto, all of the testimony contained on page 617, line 23, down to and including line 6 of page 618. That means, ladies and gentlemen, that you are to disregard that testimony and are to draw no inferences or presumptions therefrom. Now, is there anything further to be presented to the Court in the matter of testimony, gentlemen? MR. BUSCH: The People have rested, your Honor. THE COURT: Yes, I know they have. I am asking the defense. MR. STRONG: Your Honor, I think you ought to read to the jury what has been stricken.''

The questions and answers were read to the jury, after which the court again instructed the jury that the matter just read was stricken and that the jury was not to draw any inferences or conclusions from the testimony or any inferences from the question.

The matters before the court were the defendant's motion that the question asked Cohen and his answer be stricken, and the assignment of the asking of the question as misconduct. They were for the consideration of the court alone, and could properly have been brought to the attention of the jury only by a direction that the question objected to and the answer were stricken from the record and should not be considered by the jury. Especially, the matter of the good faith of the deputy and his reasons for asking the question of Cohen should not have been ruled upon in the presence of the jury.

Not content to let the matter rest, Mr. Busch, at the inception of his closing argument, revived it, saying: ''They talk about Sammy here. They have talked about Jack O'Hara. Now, I am going to talk to you a little bit and answer these arguments because they have impugned my integrity in this case, too. *I have been in this position for eight years, and I*

*defy anybody to show where any time I have prosecuted a case that I have ever acted in bad faith."*

There had been no charge of bad faith other than the one in connection with the questioning of Cohen. The protestation of good faith to the jury in the argument necessarily related to that matter, and recalled to the minds of the jurors the court's announced finding that the deputies had acted in good faith but had been unable to prove that Cohen made the remark. The court's remarks on the subject constituted a gratuitous vindication and endorsement of the improper questioning by the prosecutors. No less improper was the self-praise of the prosecutor, in which he again told the jury that he had good reason for the questions he had asked.

The questioning of Cohen was manifestly improper and unjustifiable. That the question was asked in good faith was disproved by the attempted justification. As previously shown, one of the deputies, Mr. Ford, stated that he had been informed by the other deputy, Mr. Busch, that he (Busch) had been told by an investigator of the district attorney's office that he, the investigator, had been told by an unidentified prostitute that she had been told by one Phil Packer, who was known to the district attorney's office to be a close confidant of Mickey Cohen, that he had heard Cohen make the statement in question. This, indeed, was a pitifully inadequate excuse for the questioning.

If there had been any doubt as to the devastating effect of the question upon defendant's case, it was removed by the statements which the court made to the jury. The question itself implied that the deputies knew, or had been reliably informed, that Cohen did make the statement "Now, Sam, now." The court's statement to the jury that after an investigation the court had found that the question was asked in good faith was an affirmation that the court had ascertained that the deputy had been reliably informed and believed that Cohen made the statement; and the court magnified the harm, immeasurably, by its amazing statement that the question was asked by the deputy in good faith *"but that because of circumstances beyond their control they are unable at this time to follow through."* This was to tell the jury that there was at least one witness who heard Cohen make the remark, but that the district attorney, through no fault of his own was unable to produce the witness.

The undoubted purpose of the question was to suggest to the jury, and it could not have failed to suggest to them, that

Cohen had, in fact, made the statement. If he made the statement it would have meant that he and defendant had, together, planned the shooting of O'Hara. It would have meant that they were lying in wait for O'Hara and that defendant did shoot him at the direction of Cohen.

While defending the questioning, the People rely mainly upon the contention that all harm was removed by striking out the evidence and instructing the jury to disregard it. This is a vain effort. No admonition, however strong, could possibly have erased from the minds of the jurors the belief that the deputy knew, and that the court had found that he knew the incriminating remark had been made, and yet the deputy, despite his desire and efforts, was unable to make proof of the fact.

Upon the present record, the only inference that would have warranted the first degree verdict would have been that the murder of O'Hara had been prearranged. The verdict implies that the jurors believed it had been prearranged between defendant, Cohen, and others. There was much in the way of insinuation and suggestion, throughout the trial, which tended to illuminate and support the theory of the prosecution that Cohen was probably the instigator of the crime, and that he had Lo Cigno seated beside him for the purpose of doing the shooting. This was illustrated in many instances in addition to the foregoing.

The theory of conspiracy was developed in another manner. In the cross-examination of Cohen, he was shown the three guns that had been recovered from the trashcan and was asked whether any of them had ever belonged to him; he replied that one of them resembled one of his guns but that he could not identify any of them as a gun which he had previously owned. He testified that after his conviction for income tax evasion all the guns which he then owned were sold at auction and he had had none of them in his possession since that time. It was stipulated that this auction sale took place May 5, 1951, when five guns were sold, and that none of the three guns was included in the sale. The People called Neal Hawkins, who testified that in June 1950 he was a bodyguard for Cohen; he took seven hand guns belonging to Cohen to a pistol range, where they were tested, in company with John O'Mara; he identified two of the guns that had been found in the trashcan as among the seven which he had tested, and he testified that as soon as he had tested them he had returned them to Cohen. O'Mara was called and testified

that he had participated with Hawkins in testing seven guns and had placed identifying marks upon them; the two guns that had been identified by Hawkins were shown to O'Mara and he identified them as two of the seven which he had tested. All this was over objection by defendant.

The three guns were offered in evidence. In chambers the People contended that the presence of the guns in the trashcan was a potent circumstance tending to prove that Cohen and his friends, including defendant, had conspired to kill O'Hara. The offer was objected to and the objection was sustained. However, the court later ruled that the two identified by Hawkins as guns formerly owned by Cohen would be admitted in evidence for the limited purpose of impeachment of Cohen, and the third would be admitted for the reason that it had been shown to Cohen, and, although he did not identify it, he admitted that at one time he had owned a gun having the same general appearance. The deputy stated at the time that he did not claim that the third gun was used in the shooting of O'Hara.

The three guns were not admissible in evidence for any purpose. It had already been proved that none of them was used in the shooting of O'Hara. There was no evidence whatever that Lo Cigno had ever owned or been in possession of any of the guns or had any knowledge of them. It was manifest that the presence of the guns in the trashcan some hours after the shooting indicated that several of Cohen's friends had come armed, but it did not tend in the slightest to establish any of the circumstances of the killing. The guns had no relation to a fact in dispute and did not make up an item in the sum of the evidence, which would have been required to justify proof of their presence in the trashcan. (Code Civ. Proc., § 1954.) ■■ It is an elementary rule that weapons or other articles which might have been used in the commission of a crime are inadmissible in the absence of evidence tending to prove that the weapon or article was in the possession of the defendant. (*People* v. *McCall,* 10 Cal.App.2d 503 [52 P.2d 500] ; McBaine, California Evidence Manual [2d ed.], § 583, p. 189.) ■■ Usually, evidence of the existence of the material object is introduced for the purpose of proving that it was a means of the commission of a violent crime. ■■ Here, receipt of proof of the presence of the guns for all purposes would have tended to prove only the existence of a conspiracy between Cohen, and the possessors of

the guns. Mere evidence that defendant had friends who carried guns did not tend to prove any material or relevant fact and should not have been admitted. (*People* v. *Riser,* 47 Cal.2d 566, 577 [305 P.2d 1].) It was highly prejudicial. The misuse of such evidence to the prejudice of the accused has frequently caused the reversal of convictions. The court properly ruled that evidence of the discovery of the guns in the trashcan was not relevant to any issue in the case. But receipt of the evidence as impeachment of Cohen was clearly in error, and highly prejudicial.

The cross-examination of Cohen with respect to his ownership of the guns was upon an immaterial and irrelevant matter and the People were bound by his answers. It is an invariable rule that the testimony of a witness elicited on cross-examination cannot be impeached by contrary evidence unless the testimony sought to be contradicted was relevant and material as proof of a fact in issue.

 In *People* v. *Malicoat,* 89 Cal.App.2d 742, 745 [201 P.2d 850], the court pointed out the error of eliciting evidence of impeaching character without laying a proper foundation and said further: ''The more grievous error, however, was to allow the testimony at all. It is elementary that a cross-examiner is bound by the witness' answer to irrelevant questions and 'may not cross-examine his adversary's witnesses upon irrelevant matters for the purpose of eliciting something to be contradicted.' (27 Cal.Jur., Witnesses, § 81, p. 107.) If the witness had answered the improper questions put to her on cross-examination in the affirmative the damage to the defendant would be clear. (*People* v. *Padilla, supra,* 143 Cal. 158 [76 P. 889].) The damage is equally clear when the evidence is introduced as impeachment of the witness' testimony given in answer to the improper questions put on cross-examination. (*People* v. *Worthington,* 105 Cal. 166 [38 P. 689].) It is true that the court instructed the jury that the evidence was introduced only for impeachment purposes and was not to be considered as proof of the truth of the facts stated. Where evidence is properly admissible for a limited purpose only the courts recognize the danger that it may be improperly considered by the jury for other purposes (*Adkins* v. *Brett,* 184 Cal. 252, 256-259 [193 P. 251]) but that is a risk which must ordinarily be taken if the evidence is admissible for some purpose, and a cautionary instruction limiting its use to the proper purpose is all the protection that the party can be given under the circumstances. For

this reason it is generally held that there is no prejudice from the admission of such evidence where the jury is properly instructed as to its limited purpose. (10 Cal.Jur. § 105, p. 815.) But where the evidence is not admissible for any purpose the reason for the rule ceases. There is no justification for the risk of its misuse by the jury and if the fact of its misuse seems at all probable the courts should not hesitate to find prejudice in the error.''

To the same effect are *People* v. *Farnell,* 156 Cal.App.2d 393, 401 [319 P.2d 749], and *People* v. *Burness,* 53 Cal.App.2d 214 [127 P.2d 623], where numerous cases are cited.

■■■ When the court ruled that the presence of the guns was immaterial to any issue in the case the force of the ruling was to bar the evidence for impeachment purposes. Furthermore, the presence of the guns in the trashcan and proof that Cohen had previously owned two of them was not contradictory of anything to which he had testified. He did not deny having owned them. It was not claimed by the People that the evidence of the presence of the guns was offered for the purpose of impeachment of the testimony of Cohen with respect to anything other than his testimony that all his guns were sold in 1951. This testimony was not impeached by the presence of the guns in the trashcan. There was no justification whatever for admission of the guns in evidence for any purpose.

It was forcefully argued to the trial court, as it is here, that the display of the guns throughout the trial, their exhibition to the witnesses and the jury, and their introduction in evidence was extremely prejudicial. We are in full agreement. Notwithstanding the fact that it was not proved that any of the guns was in the possession of any of the persons who were seated at the table where defendant was seated, the jurors would have understood that it was the purpose of the People to show that three of Cohen's and Lo Cigno's friends had come to the restaurant armed. This purpose of the People was clearly disclosed to the court in urging admission of the evidence. Although it warranted a strong suspicion that the several persons at the table were armed, it was not evidence of a conspiracy to shoot O'Hara. Whatever the purposes of others may have been, they could not be imputed to defendant on mere suspicion. The jurors could not have failed to entertain a strong suspicion that the guns had been provided by Cohen for use in the slaying of O'Hara. The very fact that they were introduced as impeachment of the testimony of

Cohen meant that the presence of the guns at the restaurant contradicted his testimony that he had previously sold all his guns, therefore, if he had not sold them he probably provided them for some of his friends on the night of the shooting. Thus, without a word of evidence to connect the defendant with the intentions or actions of Cohen or his associates, the People were able to accomplish their purpose of casting suspicion on defendant as a conspirator in a ''gangland'' murder.

Defense counsel correctly argued to the court that the shooting of O'Hara was being pictured as a ''gangland'' crime, the rubbing out of one gangster by another in the course of underworld warfare.

After the court had ruled that evidence of the presence of the guns would be received for the purpose of impeachment only, the defense requested that the jury be instructed that it was not to be considered for any other purposes. The court declined to give that admonition, stating, ''We will instruct the jury in all matters of law at the proper time, and expect counsel to prepare a special instruction on that situation.'' The People submitted nothing. The defense submitted and the court gave the following instruction which did not purport to take the place of the requested admonition: ''Some evidence has been admitted as to alleged prior inconsistent statements made by some witnesses. Such evidence is not to be considered by you for any other purpose than in weighing the credibility of the witness. You are not to accept any of the statements as to the truth of their contents. You may disregard any part or all of such statements, if you see fit to do so. You are the sole judges of the credibility of the witnesses.''

The instruction was not applicable to the evidence concerning the guns or the testimony of Cohen. It was utterly without meaning as an admonition. The responsibility rested with the court to give a proper admonition. This it failed to do.

However, if the court had admonished the jury to consider the evidence only as impeachment of Cohen, the error of admitting it at all would have been rendered no less glaring and harmful.

Nothing could have removed the impression in the minds of the jurors that there were at least three persons who, in concert with defendant and Cohen, were lying in wait for O'Hara. The tendency of the evidence to prove deliberation and premeditation was undeniable. The error of the court was

irremediable. (*People* v. *Malicoat, supra,* 89 Cal.App.2d 742, 745.)

There were other attempts to prove that the killing had been prearranged. Roger Leonard was called by the People. He was shown a fingerprint card, and over objection, answered that he remembered having placed his fingerprint on a card. He identified his signature on the card. He was shown the cellophane bag and the three guns and was asked whether he recognized them, and stated that he did not. He was shown the guns separately and denied having ever had any of them in his possession, or having touched any of them. He was asked whether he had seen Lo Cigno touch any of the guns the night of December 2 and answered in the negative. Outside the presence of the jury, the People requested permission to have Leonard fingerprinted by an expert in order to lay a foundation for evidence that Leonard's fingerprints were on one or more of the guns. Objection was made that the prosecutor was attempting to impeach his own witness. In answer to a question by the court, the prosecutor admitted that evidence that Leonard's fingerprints were found on one or more of the guns would affect his credibility, but he denied that his purpose was to impeach the witness. When the court declined to order Leonard to submit to fingerprinting, the prosecutor announced that he would proceed by another method to prove that Leonard's fingerprints were on the gun. He called Andrew Durko, a police officer, who identified the card as one he had made out and upon which Leonard, while under arrest, had placed his fingerprint. This evidence was received over objection and a motion to strike the same was denied. The People called A. R. McLaughlin, and qualified him as a fingerprint expert; they produced a fingerprint card bearing date 12-6-43 and another bearing date 12-13-50, which were marked for identification. In chambers, the People stated they intended to prove by the fingerprint evidence that Leonard had the three guns in his possession on the night of December 2, but that they could not produce evidence that any of the guns contained the fingerprint of Lo Cigno. The People argued that since Leonard was seated at the table with defendant the fact that his fingerprints were on the guns, or any of them, would tend to show that a conspiracy existed between Leonard and defendant for the killing of O'Hara. The People made a further offer to prove that the testimony of McLaughlin would be that there were no fingerprints of O'Hara, Rocky

Lombardi or Joe Herrara on any of the guns. Assigning the questioning of McLaughlin as misconduct, defendant made strong objection that the line of evidence which the prosecutor proposed to produce would create an "aura of suspicion" that a conspiracy existed among the friends of Mickey Cohen for the slaying of O'Hara. The prosecutor admitted as much, and replied: "We have stated that we will attempt to bring before this court all of the true facts concerning the death of Mr. Whalen that we can before the Court, and if ultimately those facts show, to use the word counsel has brought into this trial, not I, if they show a conspiracy, so be it."

The court rejected the offers of proof and later instructed the jury that the People had offered certain exhibits in evidence, and had made an offer of proof, to which the defendant had objected; that the court had ordered stricken the testimony of Leonard with respect to the identification card that had been shown him and "regarding the guns"; also, that the testimony of McLaughlin "regarding the guns and the *alleged fingerprints on them*" was stricken (this was the first the jury had heard of the existence of Leonard's fingerprints on the guns, which fact, the jury, no doubt, had already suspected); and also that the testimony of Durko relating to the identification cards was stricken. The court stated to the jury "Up until any further ruling in that connection, you will disregard those exhibits and that testimony." These were wasted words. By questioning Leonard, by exhibiting the cards to the fingerprint expert, and aided by the court's disclosure of Leonard's fingerprints on the guns, the People succeeded in informing the jury that Leonard had handled the guns. This was highly improper for the same reasons that it was improper to admit the guns into evidence. Here, again, the inescapable result was the creation of suspicion that Cohen's friends, Leonard and defendant among them, had premeditated the murder of O'Hara. We can find no excuse whatever for the proceedings which accomplished the obvious purpose to bring about that result.

After Cohen had testified that he was not acquainted with O'Hara and that he had never had any conversation with him and to the best of his recollection had never seen him before the night of December 2, he was asked on cross-examination: "Mr. Ford: Isn't it a fact that you had had conversations with him prior to that night? A. That's absolutely untrue. Q. You are sure of that? A. I am positive of it. Not sure of it, but positive of it. . . . Q. Did you ever have a

conversation with O'Hara at the Formosa Cafe? A. Absolutely not. Q. Did you ever have a conversation with Jack O'Hara at the Garden of Allah Hotel? A. Absolutely not. Q. Or the restaurant at that hotel? A. Absolutely not. Q. Did you ever threaten Jack O'Hara in some way, in any way? A. How could I threaten him? I never had no conversation with him. Q. Answer yes or no, please. A. Well, I can only answer the way you ask it to me. I never had no conversation with this man, or did I know him. Q. Did you ever threaten Jack O'Hara in any way? A. I gave my answer. MR. FORD: May the witness be directed to answer yes or no. THE COURT: You haven't answered the question yet, Mr. Cohen. THE WITNESS: Let me hear the question. THE COURT: Read the question, Mr. Davis. (Question read.) A. I did not.''

Although no objection was made to this questioning, defendant did not thereby waive his right to contend that it was improper and constituted prejudicial misconduct. Defense counsel presumably believed that the district attorney proposed to prove that Cohen had had such conversations with O'Hara, and also that he had made threats against him. The impropriety of the questioning is manifest, but we defer our discussion of it.

In his cross-examination Cohen testified that after the shooting he walked to the front entrance with Miss Hashagen and he was asked: ''MR. FORD: You hit somebody at that time?'' He answered that he hit no one but he may have pushed aside a man who spoke to Miss Hashagen. Later the People produced a witness, Gerald Sumption, who testified over objection that as he and his friends were leaving the restaurant Cohen intercepted him, cuffed him and said ''You stick around,'' and ''You are with them,'' or something to that effect.

The cross-examination with respect to the occurrence of an altercation was upon a wholly immaterial matter and not subject to contradiction, for reasons previously stated. Moreover, it added emphasis to the contention of the People that Cohen was implicated with defendant in the shooting, and centered attention upon him as the active and responsible actor in the affair. It was highly improper.

Cohen testified that before dinner he left to go to the telegraph office and when asked whether he went with any one he answered that he thought he went by himself. He was asked: ''Q. Isn't it a fact that you left with the defendant Lo Cigno? A. I did not. Q. Your memory is that you left by

yourself; is that correct? A. That's the best of my recollection. . . . Q. You are sure that you didn't go in Mr. Lo Cigno's car? A. I'm sure of it . . . Q. Now, you are sure it wasn't Mr. Lo Cigno's car that you took at that time? A. No, I'm sure I didn't take his car. . . . Q. And you went by yourself? A. That's right. Q. Are you sure of that? A. I'm almost positive of it. I don't recall anybody else going with me except my dog.'' He was then asked if he was sure he didn't go with Leonard or Miss Hashagen or Di Carlo or Reno or Piscitelle. This badgering type of interrogation was typical of the entire cross-examination of Cohen, which kept him in the forefront at all times. He was asked whether on December 2, 1959, Lo Cigno was working for him, and he answered in the negative. He was asked: ''Q. Now, immediately after the shooting didn't you see Mr. Lo Cigno place a gun on the table? A. That's absolutely false. Q. *You did not see it?* A. I didn't see any gun at all. Q. At the time Mr. O'Hara came up to the table did you have a gun on you? A. I have never had a gun on me at this time or any times up until my return home from my income tax evasion troubles. Q. That night, December 2, 1959, did you see a gun at any time? A. I did not see any gun. Q. Did you hear any discussion of guns by anybody at table 15? A. There was absolutely no discussion of guns. It was a jovial party where people were supposed to go to another party. Q. Did you hear any discussion of Jack O'Hara prior to the time that you saw him? A. I absolutely did not. . . . Q. Now, sir, you have had occasion to examine the three guns that have been marked as exhibits, haven't you?'' An objection was interposed. At this point the matter of the guns was brought up again and the court instructed the jury that the testimony of Leonard, Durko and McLaughlin respecting the guns had been stricken, and Cohen was questioned about his ownership of the guns, as previously stated. Thereafter they were admitted in evidence for the limited purpose of impeachment.

Cohen admitted on cross-examination that he had been convicted of income tax evasion and had served a term in prison. He was asked on cross-examination: ''Isn't it a fact that in Cleveland, Ohio in 1934 you were convicted of the felony of embezzlement?'' and answered that it was not a fact. In the absence of an intention to prove this former conviction, and there was no offer of proof, the question was improper. It was brought out on cross-examination that Cohen had been a professional fighter, although he said ''I wasn't too much

of a fighter," and he was asked his opinion as an expert whether O'Hara had hit Piscitelle with all of his strength. He was asked: "Q. At any time on the night of December 2, 1959 did you have anything of an alcoholic nature to drink? A. I don't drink. Q. Your answer is no? A. I say I don't drink. Q. Answer this question: Did you have anything of an alcoholic nature to drink on the night of December 2, 1959? A. I don't drink. Mr. Sugarman: I think that answers the question. Mr. Ford: I don't think it answers it. The Court: I don't think it answers it at all, Mr. Sugarman. Mr. Ford: Would you answer? The Court: We realize you don't drink, Mr. Cohen, make a habit of not drinking, but the question is: Did you have anything to drink on the night of December 2, 1959? The Witness: No. The Court: All right. That's the answer." He was asked whether during the evening he took anything out of his pocket and gave something to somebody and answered in the negative, and then was asked whether he gave anything to Phil Packer before the police got there, and answered in the negative.

Piscitelle was cross-examined as follows: "Q. When you were on your way to Rondelli's, did you expect to see Mickey Cohen there? A. Did I expect to? Q. Yes, sir. A. No, sir. Q. You have been there quite often; is that correct? A. Yes, sir. Q. *Don't you usually run into Mickey Cohen there when you go there? A. Sometimes. Q. Was there any discussion between you and Mr. Lo Cigno as to whether you should mention this O'Hara matter, whether you should mention Mr. O'Hara to Mickey Cohen? A. Definitely not. Q. When you got there, did you discuss O'Hara with Mickey Cohen at all? A. No, sir.*

In the cross-examination of Lo Cigno, he was questioned: *"Now, did you receive any money from anybody for shooting O'Hara? A. Don't be . . . definitely not."* The jury would have understood that "anybody" meant "Cohen." The impropriety of this insinuating questioning of Cohen, Piscitelle and Lo Cigno is manifest. That the questions were not asked in good faith cannot for a moment be doubted.

 In these numerous instances questions were asked of witnesses which assumed the existence of facts which would have been extremely harmful to defendant if they had existed: the question previously mentioned "Did you say the words, 'Now, Sam, now' "; the questions asked Cohen after he had testified that he had never talked with O'Hara, whether he

had not had a conversation with him at the Formosa Cafe or at the Garden of Allah Hotel or the restaurant at the hotel, and repeated questions whether he had ever threatened O'Hara in any way; the questions: "Now, immediately after the shooting didn't you see Mr. Lo Cigno place a gun on the table? A. That's absolutely false. Q. *You did not see it?* A. I didn't see any gun at all. Q. At the time Mr. O'Hara came up to the table did you have a gun on you?"; whether he took anything out of his pocket and gave it to any one else, whether he gave anything to Miss Hashagen before the police arrived, and whether he gave anything to Phil Packer before the police arrived; the oft-repeated question whether he had gone to the Western Union office before dinner with Lo Cigno or in Lo Cigno's car; whether Lo Cigno had ever worked for him.

To all of these questions Cohen's answers were in the negative. The district attorney had no reason to doubt they would be in the negative. He knew, of course, that Cohen would not admit having uttered the words "Now, Sam, now"; he knew, after Cohen had testified to everything that he had seen, that he would not testify that he saw Lo Cigno place a gun on the table; he knew that he would not admit having had conversations with O'Hara in the places mentioned in the questions; he knew that Cohen would again deny having ever made any threats against O'Hara, and that he would deny having taken anything out of his pocket and having handed it to any one before the police came, and would deny having had a gun in his possession when O'Hara came in. These and many other questions of the district attorney implied the existence of facts which the People made no effort to prove and had no reason to believe could be proved. This was misconduct. It was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied. In view of the incident in which the court had declared the good faith of the prosecutor, it would have been natural for the jurors to believe that he also acted in good faith in all of his other questioning, and had reason to believe the existence of facts which his questioning suggested. Such improper questioning tends strongly to deprive the accused of a fair trial. (*People* v. *Douglas,* 83 Cal.App.2d 80 [187 P.2d 819].)

There were other incidents too numerous to mention in which the cross-examination of defendant was unfair. One of these was the questioning of defendant about one, Fred Sica, by Mr. Busch: "Q. He was a close friend of yours, wasn't he?" Defendant answered that he saw Sica at the restaurant and was asked: "All right. Did you talk to him about these threats? A. No, I did not, sir. . . . Q. With relation to your state of mind, *had you ever heard that Mr. Sica had a particular reputation?*" An objection to the question was sustained, whereupon the following occurred: "Q. BY MR. BUSCH: In any event, then, Mr. Lo Cigno—by the way, did you ever work for Mr. Sica? A. No, I haven't, never. Q. Ever run any errands for him? A. No, I never did. Q. You didn't talk to him about this? A. No, I didn't, definitely not. Q. You saw Mickey Cohen there that night? A. Yes. Q. How long have you known Mickey Cohen? A. I have known Mickey Cohen fourteen, fifteen years, I mean throughout the fourteen, fifteen years. Q. And in that period of time have you in your state of mind learned of any reputation Mr. Cohen may have had?" An objection to the question was sustained. "Q. BY MR. BUSCH: Well, let me ask you this, Mr. Lo Cigno: Did you think that you ought to go to anybody for help because somebody had threatened you? A. No, I didn't, sir. I just wanted to get together with George to try to find out who we could find that knows this man to discuss this problem with him. Q. In other words, you were of the frame of mind, then, in this petrified state—— A. That's right, sir. Q. ——that you didn't have to go to anybody for help? A. No, sir, I never went to anybody in my life for anything. Q. Was it your frame of mind, then, while you were so petrified of Jack O'Hara that you didn't even mention it then to Mr. Cohen? A. No, I didn't, sir."

We have spoken of Cohen as "an ex-mobster and racketeer" and commonly known as such. The questions asked by the prosecutor implied that it is well known that Sica enjoys a similar reputation. They clearly insinuated that Sica was of evil reputation and a close friend of defendant's. It is said in the brief of the attorney general: "Appellant objects to the prosecutor's question as to appellant's association with Fred Sica or Cohen. The prosecutor was merely getting at whether appellant was really frightened. The fact that he knew and saw that night *two lords of the underworld* yet didn't seek help was a circumstance demonstrating appellant's state of mind."

 Lo Cigno testified he had never fired a gun before and was asked: "Q. Did you on December 2nd, sir, feel you were familiar enough with a gun to know that it could stop an individual regardless of size? A. Well, I was always under the impression that when a person would look at a gun, he would just stop. Mr. Busch: Could I have that stricken? Mr. Strong: It is responsive, your Honor, if I may suggest. The Court: I can't agree with you, Mr. Strong. The motion to strike is granted. Read the question. (Question read.) Mr. Strong: He answered that a gun would stop a person. He didn't say 'firing a gun.' The Court: The Court has ruled." The answer was responsive, it was highly material and should not have been stricken.

 In another instance an officer called by the People produced records seized at the time of the arrest of the bookmaker, Al Levitt. It was made plain that the purpose of the People was to prove the making of bets by defendant and Piscitelle with Al Levitt, in order to contradict the testimony of defendant that he and Piscitelle did not owe money to Levitt. The matter was discussed in chambers and an objection was sustained. There was no effort made and no intention expressed to lay a foundation for the proposed hearsay evidence. Although the objection was sustained the jury would naturally have gained the impression that there were records which would contradict the testimony of defendant and Piscitelle with respect to Levitt's claim against them. The matter was immaterial. The questioning was improper.

 We have previously mentioned that Lo Cigno was asked whether he had been paid anything for shooting O'Hara. The question was highly improper. It was calculated to create the impression that the district attorney believed that Cohen had paid Lo Cigno to shoot O'Hara. The purpose of this entire line of questioning was undoubtedly to create a belief in the minds of the jurors that all the insinuated facts existed or were believed by the district attorney to exist, although they were not susceptible of proof. And Mr. Busch did not overlook strengthening the impression by assuring the jury that in his eight years as a prosecutor he had never acted except in the best of faith.

It is fair to say that throughout the trial the People treated Mickey Cohen as the central figure in the murder and the others, including Lo Cigno, as merely his henchmen, subject to his directions and control. This was manifested in too many ways to be enumerated in our opinion. The direct

examination of Cohen covers 20 pages of the reporter's transcript; the cross-examination of Cohen covers 114 pages. Although searching cross-examination should always be permitted, there are limits beyond which it becomes excessive. After Cohen had testified, on cross-examination, to having seen nothing while he was hiding under the table after the shooting had taken place, the prosecutor propounded some 10 additional questions, wholly immaterial, as to what he had seen or had not seen or could have seen. He also insisted, without success, that Cohen should physically demonstrate the manner in which he got under the table. Witness after witness was asked on cross-examination whether he or she had not come to the restaurant to meet Cohen. Although in the direct examination of Cohen he merely described what he had witnessed and stated that he did not know and had not spoken to O'Hara, he was accused in argument to the jury of having given false testimony in 100 instances.

The People succeeded in painting a picture of what the defense characterized as a gangland murder committed by the associates of Mickey Cohen. But the effort of the People was to establish not by evidence, but by mere suggestion and innuendo, that Lo Cigno had probably conspired with the others to murder O'Hara and that the shooting was deliberate and premeditated.

One of the deputies made the most of this in his argument. He cautioned the jurors not to believe that Piscitelle and Lo Cigno were ''Boy Scouts'' and ''This group of people aren't special people. These Jack O'Haras, they are not special, and they get no favors. They [defense counsel] want you to think they are from the Boy Scout troop. . . . It is pretty hard to get at the truth in this case with these liars that have testified here. *It is like a bunch of human sewage passing through.*'' It is not only unseemly but most unfair for a prosecutor to stoop to such billingsgate in order to prejudice the minds of the jurors against an accused. The court should not have permitted it. At another point Mr. Busch referred to a statement of defense counsel saying ''That's a lie. That is just an unmitigated lie.'' We think that it would profit some prosecutors, and judges who do not keep trial proceedings under control, to read the opinion in *People* v. *Talle*, 111 Cal.App.2d 650, pages 672 and 673 [245 P.2d 633], and the cases there cited.

We have previously stated that the questioning of Cohen whether he had not directed Lo Cigno to shoot O'Hara re-

quires a reversal of the judgment. The other matters discussed not only magnify the harm of the misconduct of the prosecutor and the errors of the court in permitting the questioning of Cohen, and the impossibility of removing the harm by the admonitions that were given the jury, but they further demonstrate the utter unfairness of the trial.

Had the jurors not believed that a conspiracy existed for the murder of O'Hara they would have had no reason for returning a verdict of first degree murder. And as we have said, there was no word of evidence that defendant had ever mentioned to any one except Piscitelle and Amereno that he had anticipated trouble with O'Hara, and no evidence that he had arranged to meet Cohen or any of his associates at the restaurant. The deficiency of the People's evidence to prove premeditation could not be supplied by evidence that Lo Cigno was an associate of Mickey Cohen and the other hoodlums who were assembled about him at the time of the shooting.

The People submitted instructions in the law of manslaughter but stated at the same time that "involuntary manslaughter doesn't belong there at all. . . . Neither side wants manslaughter in there. I don't want to argue manslaughter." In the discussion of an instruction on voluntary manslaughter, Mr. Sugarman stated that the defendant would object to it and Mr. Strong said: "We don't think there is any possibility. It is either murder, first or second degree, or nothing." When the court mentioned an instruction on voluntary manslaughter, Mr. Strong said: "That is the one we object to." The court decided not to give an instruction on manslaughter and none was given. It is now contended that the court nevertheless should have instructed on manslaughter. Defendant is not in a position to complain of failure to give the instruction. The defense made clear the desire that the jury be instructed in a manner that would require either a verdict of guilty of murder or acquittal. Defense counsel very evidently entertained the belief that if the jury was left free to return a verdict of manslaughter it would be less likely to return a verdict of acquittal. This reasoning was not illogical, although it is now contended that the evidence warranted a conviction of manslaughter, at most. Under the circumstances it was not error to fail to instruct on manslaughter. Upon a retrial of the case appropriate instructions on manslaughter should be given.

At the request of defendant the court instructed as follows: "The burden of the proof in this case is always on the prose-

cution, as to every element of the case. This burden never shifts to the defendant. Since the defense is self-defense, the burden of going forward with proof of self-defense is on the defendant. Nevertheless the burden of proof remains with the prosecution.'' The instruction having been given at defendant's request it is unnecessary to determine whether error was committed.

Defendant's final contention is that if the judgment is not reversed it should be modified to a judgment of voluntary manslaughter. Defendant does not seek a modification to second degree murder, and it was so stated on oral argument. That question is not considered in the briefs. We are not called upon to decide whether the evidence would have warranted a verdict of second degree murder.

 It is not a proper case for modification of the judgment. There was substantial evidence which would have warranted the jury in finding that defendant killed O'Hara in self-defense. He has not been afforded a fair trial of that issue, nor of the question whether the offense was voluntary manslaughter. Upon a retrial he may be acquitted, or convicted, only of voluntary manslaughter. In that connection we hold only that the evidence was insufficient to support the verdict of murder of the first degree.

The judgment and the order denying motion for a new trial are reversed.

Vallée, J., and Nourse, J. pro tem.,* concurred.

A petition for a rehearing was denied July 25, 1961. Nourse, J. pro tem.,* was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied August 23, 1961.

---

*Assigned by Chairman of Judicial Council.