[No. D001392. Fourth Dist., Div. One. May 9, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
LELAND EUGENE BLACKINGTON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Certified for publication with the exception of sections II through V.

**COUNSEL**

Charles M. Sevilla, under appointment by the Court of Appeal, and Cleary & Sevilla for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Jesus Rodriguez and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WIENER, Acting P. J.**—Defendant Leland Eugene Blackington appeals from a judgment of conviction entered after a jury found him guilty of second degree murder (Pen. Code, §§ 187, 189)[2] by use of a firearm (§ 12022.5). We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

The basic facts surrounding the incident giving rise to these charges were not disputed at trial. What was at issue was the motivations of the parties, particularly Blackington, and certain facts which tended to shed light on those motivations.

---

[2]All statutory references are to the Penal Code unless otherwise indicated.

Beverly Humphreys was divorced from Blackington in 1981. She was awarded custody of their two children, Amber, age 10, and Chad, age 8.

In 1981, Blackington did not return Chad after a scheduled visitation and fled with the boy to North Carolina. Beverly was forced to go to North Carolina with her then-boyfriend, Eric Humphreys, to institute court proceedings which resulted in Chad's return to San Diego with Beverly in August of 1981. Between that time and the date of the incident in question—November of 1983—Blackington's contacts with his ex-wife and children consisted of a single phone call.[3] Beverly and Eric Humphreys were married in 1982.

On November 8, 1983, Beverly and Eric Humphreys and Beverly's two children were staying with a friend, May Small. In the late afternoon, Chad and May's son, Jimmy, were playing in the front yard. Chad came running inside to tell his mother that Blackington was outside with Beverly's brother, Donny Eldred. In response, Beverly, May and at some point, Eric went out onto the front porch. Beverly told May to call the police. Eldred, yelling and swinging a baseball bat, broke the driver's side window on the Humphreys' van, which was parked in front of the house.

Eric began to approach Blackington. Blackington pulled a handgun from his back pocket and, when Humphreys was approximately five feet away, he fired. The single shot was fatal.

The prosecution's theory of the case was that Blackington and Eldred went to the Small residence on November 8 intending to engage Eric Humphreys in an altercation and kill him. Consistent with this theory, the prosecutor viewed Eldred's breaking of the van window as a attempt to draw Humphreys from the house and provoke a fight.

The defense explanation was that Eldred had related to Blackington the poor conditions his children were living in with Eldred's sister and Eric Humphreys.[4] As a result, Blackington was determined to check on his children's welfare. Fearful for his safety because of a prior assault Humphreys had made on him and Humphreys' demonstrated reputation for violence,[5]

---

[3]Blackington failed to pay any child support during this period.

[4]Eldred also told Blackington that his children were being beaten by Eric Humphreys.

[5]Extensive and uncontradicted evidence of Eric Humphreys' reputation for violence was presented at trial. In addition, several witnesses testified to having heard Humphreys threaten to kill Blackington. Other witnesses testified that Humphreys, who stood six feet seven inches tall, became especially violent when he drank. A toxicologist with the county coroner's office reported that Humphreys had a blood alcohol content of .10 at the time of his death, which meant that the alcohol content at the time of the shooting would have been approximately .11.

Blackington borrowed his father's handgun and gave Eldred a baseball bat before going to the Small residence.

The disputes in the testimony generally focused on several matters which had a tendency to support or refute one of the respective theories of the case. For instance, there was a question whether Eric Humphreys emerged from the house at the same time as Beverly, before the van window was broken or only after the window was smashed. The prosecutor relied on the latter testimony to suggest that the window was broken as a technique to force Eric Humphreys out of the house. Also, Humphreys' actions just before the shot was fired were the subject of dispute. Blackington testified that Humphreys continued advancing on him despite his having pulled the gun as a warning. Other witnesses testified that Humphreys stopped and said something to Blackington before the shot was fired.

Blackington had no prior criminal record. He surrendered himself to San Diego police the same night as the shooting and was charged with first degree murder. At trial, he contended he only fired the gun in self-defense based on his reasonable belief that Humphreys was about to inflict serious bodily harm. The jury disagreed, however, and found him guilty of second degree murder.

## DISCUSSION

■ Blackington's major contention is that the prosecutor committed prejudicial misconduct by reading from a prior out-of-court statement made by Donny Eldred while the prosecutor was cross-examining defendant. The prosecutor's conduct resulted in the trial court declaring a mistrial as to Eldred, who at that point was being jointly tried with Blackington. We have concluded that a similar remedy should have been afforded Blackington. In the interest of judicial economy, we also address several of Blackington's additional contentions concerning issues which presumably will arise on retrial of the case.

### I

Donny Eldred made a lengthy postarrest statement to police. Based in large part on that statement, Blackington moved for a severance under the principles of *People* v. *Aranda* (1965) 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265]. In opposing the motion, the prosecutor represented to the court and defense counsel that he did not intend to offer Eldred's statement as evidence in his case-in-chief, but that it would be used only if Eldred took the stand to testify, which was not anticipated. The court then denied the severance motion.

Eldred did not take the stand. Nonetheless, in his cross-examination of Blackington the prosecutor repeatedly referred to a copy of Eldred's statement, asking Blackington whether he had made certain statements to Eldred which tended to discredit Blackington's self-defense theory. When the first of these alleged statements was quoted, counsel for Blackington made a general objection which was overruled.[6] Thereafter, the prosecutor continued to intersperse quoted and paraphrased statements in the leading questions he asked of Blackington.[7]

Following Blackington's cross-examination, Eldred's counsel moved for a mistrial, stating as follows: "During the cross-examination of the last witness the prosecutor directly read from [Eldred's pretrial] statements and made obvious that he had statements in front of him by moving the pages back and forth and underlining and such, and there were eight to ten questions, '[d]idn't you say A, B, C,' all of which were met with no. I think that has obviously told the jury that he has information he can't show them or something along those lines. I think it is misconduct, . . ." Counsel for Blackington also joined in the motion. "It was apparent to me that Mr. Stahl [the prosecutor] was reading statements out of the information he had in front of him and turning it back and forth in front of the jury and cross-examining my client on those statements from Mr. Eldred. My client denied that those statements were made, and I think it is a denial of my right to confront and cross-examine witnesses, and also in violation of the agreement that we reached at the *Aranda* hearing, and I would also move for a mistrial." In response, the prosecutor did not deny that he was reading from Eldred's statement when he formulated his questions to Blackington. "I

---

[6]Blackington's counsel objected on the ground that the prosecutor's question "state[d] facts not in evidence." He later explained he avoided a more specific objection for fear of emphasizing to the jury the existence of Eldred's pretrial statement to police.

[7]The following examples illustrate the prosecutor's tactic: "Q. You don't recall you talked to Donald about taking care of Eric?

"A. We never talked about hurting Eric.

"Q. You never talked about hurting Eric. You never told Donald, 'Don't worry. Just get him outside, and I will take care of him at that point.'

"A. Huh-uh.

"Q. You never made that statement?

"A. I don't recall making that statement.

" . . . . . . . . . . . . . . . . . .

"Q. You didn't mention to Donald, 'It's okay because I got a gun.'?

"A. I didn't mention that.

"Q. Didn't you tell Don, 'Don't worry, this will be okay. It will be cool.'

"A. I don't remember saying anything like that.

"Q. You didn't tell Don that he would be okay if he just kept his mouth shut, and he would only get about six months if they caught him?

"A. I don't remember saying anything like that.

"Q. You didn't talk about that with Don?

"A. I don't remember talking about anything like that to Don."

don't concede what I was doing was in any way violative in that I wasn't going to use Mr. Eldred's statement either in a written form or eliciting them from a police officer or in a tape recorded form. I don't think it violated that at all. [¶] I am entitled to look at any report I so please if [I] am going to formulate questions against anybody, and I am entitled to look at any material if I want to dream up things or read books to decide what I was going to use as far as the basis for materials for questions against any witness I want." The court then ruled on the motion as follows: "The questions and answers relate to your client and as to what was attributed to your client, attributing that to Mr. Eldred. The motion for mistrial is granted as to Mr. Eldred and denied as to Mr. Blackington."

The issue of whether the prosecutor's questions constituted misconduct is framed for us by a series of Supreme Court and Court of Appeal cases. The first and perhaps leading case is *People* v. *Lo Cigno* (1961) 193 Cal.App.2d 360 [14 Cal.Rptr. 354]. Defendant Lo Cigno, like the defendant in the present case, was charged with first degree murder and defended on the ground that the killing was in self-defense. Also like Blackington, Lo Cigno testified that the victim's prior threats and reputation for violence caused him to fear for his safety and to respond more precipitously to a threatening situation. (*Id.*, at pp. 367-368.) The prosecution theory in *Lo Cigno* was that the killing was the premeditated result of a conspiracy between Lo Cigno and one or more of his friends. In cross-examination of one of those friends, Mickey Cohen, who was present at the scene of the shooting, the prosecutor asked the witness whether he told Lo Cigno "Now, Sam, now" just before Lo Cigno fired the fatal shot. (*Id.*, at p. 371.) The witness vehemently denied making such a statement and the prosecutor produced no independent evidence that such a statement was made. Later, in cross-examining Lo Cigno, the prosecutor asked him whether anyone had paid him for shooting the victim. Predictably, the suggestion was strenuously denied and, again, the prosecutor produced no evidence to substantiate the suggestion. (*Id.*, at p. 387.)

On appeal after a first degree murder conviction, the Court of Appeal reversed, finding that the prosecutor's actions constituted clear misconduct. The court concluded: "These and many other questions of the district attorney implied the existence of facts which the People made no effort to prove and had no reason to believe could be proved. This was misconduct. It was improper to ask questions which clearly suggested the existence of facts which would have been harmful to defendant, in the absence of a good faith belief by the prosecutor that the questions would be answered in the affirmative, or with a belief on his part that the facts could be proved, and a purpose to prove them, if their existence should be denied." (193 Cal.App.2d at p. 388.)

*Lo Cigno* was relied on by the Supreme Court a year later in *People* v. *Perez* (1962) 58 Cal.2d 229 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], disapproved on other grounds in *People* v. *Green* (1980) 27 Cal.3d 1, 32 [164 Cal.Rptr. 1, 609 P.2d 468]. The prosecutor in *Perez* cross-examined a defense witness by asking whether he had been threatened by the defendant. The witness said "No" and the prosecutor introduced no evidence of any such threat. (*Id.,* at p. 240.) The jury was then reminded of the implication in closing argument by the prosecutor who attacked the witness' credibility by suggesting he was " 'worried for his own safety.' " (*Id.,* at p. 241.) Citing the *Lo Cigno* standard, the *Perez* court concluded that the prosecutor's question and argument were improper. (See also *People* v. *Hamilton* (1963) 60 Cal.2d 105, 116 [32 Cal.Rptr. 4, 383 P.2d 412]; *People* v. *Shipe* (1975) 49 Cal.App.3d 343, 349-350 [122 Cal.Rptr. 701].)

The United States Supreme Court has also recognized that a prosecutor's attempt to get before a jury information not properly admissible as evidence may violate a defendant's rights under the confrontation clause of the Sixth Amendment. In *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074], a previously convicted accomplice, Loyd, was called to testify at defendant Douglas' trial. He refused to answer questions on self-incrimination grounds because his conviction was then on appeal. The prosecutor proceeded to read portions of Loyd's alleged confession, pausing periodically to inquire whether Loyd had in fact so stated. Loyd repeatedly claimed his Fifth Amendment privilege and refused to respond. The Supreme Court reversed Douglas' conviction, holding that the prosecutor's manner of presenting Loyd's confession deprived Douglas of his constitutional right to confront and cross-examine Loyd as to the accuracy of his alleged confession. (*Id.,* at pp. 419-420 [13 L.Ed.2d at pp. 937-938].) The court concluded that "[a]lthough the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; . . ." (*Id.,* at p. 419 [13 L.Ed.2d at pp. 937-938].)

*Lo Cigno, Perez* and *Douglas* mandate the similar conclusion in the present case that the prosecutor's questioning of Blackington was improper.[8] As a factual matter, there appears to be no question that the prosecutor was

---

[8]We further observe that the conduct engaged in by the prosecutor in the present case is inconsistent with standards of professional responsibility established for the legal profession. The new American Bar Association, Model Rules of Professional Conduct specifically provide that "[a] lawyer shall not . . . in trial, allude to any matter . . . that will not be supported by admissible evidence . . . ." (Rule 3.4(e).) This rule merely continues the prohibition previously expressed in DR 7-106 (C)(1) of the American Bar Association Code of Professional Responsibility. (See also *People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396].)

reading from Eldred's pretrial statement when he cross-examined Blackington. His "defense" of his actions conceded as much in that he argued, "I am entitled to look at any report I so please if [I] am going to formulate questions against anybody . . . ." (See *ante,* p. 1221.) Moreover, he did not deny the contention made by both defense counsel that he made no effort to conceal from the jury he was reading from quoted material in posing his questions to Blackington. The trial court's decision to grant a mistrial as to Eldred impliedly confirms this conclusion.

As in *Lo Cigno,* the prosecutor's insinuations went to the critical issue in the case. Blackington admitted the shooting but claimed it was in self-defense, without any intent to kill. The prosecutor attempted to discredit Blackington by arguing the killing was intentional and premeditated. By suggesting planning and an intent to "take care" of Eric Humphreys, Blackington's alleged statements to Eldred both before and after the shooting seriously undermined the defense. Further, as in *Perez,* the prosecutor here reminded the jury of his earlier insinuations during closing argument.[9] And finally, as in *Douglas,* once Eldred's statements were presented to the jury, Blackington was denied his right to confront and cross-examine Eldred by Eldred's invocation of his Fifth Amendment privilege not to testify.[10]

The People argue that even if the prosecutor committed misconduct, it did not prejudice Blackington because the jury's second degree murder verdict indicates it rejected the prosecutor's premeditation theory. The problem with this line of analysis is that the prosecutor's insinuations also suggested an intentional and therefore malicious killing rather than voluntary manslaughter. We would also be unrealistic to discount the possibility that the jury's verdict represented a compromise.

Our conclusion is amply supported by the trial court's decision to grant a mistrial as to Eldred following the prosecutor's misconduct. While we rec-

---

[9]Ridiculing Blackington's inability to recall the substance of his conversation with Eldred, the prosecutor argued as follows: "The reason he is there in a daze and doesn't want to mention about talking about the gun and the reason he doesn't want to mention about what he talked about with Donald Eldred, and the reason he wants you to believe he just pondered this threat and terrible situation he was getting himself into is because he wants you to think he had an empty mind. He wants you to think he was so distracted that he couldn't think straight.

"Because if you buy that, ladies and gentlemen, then he can't have deliberated, could he? He can't have premeditated this killing, could he? That is why he is trying to sell you this bill of goods and has selective amnesia."

[10]We emphasize that the facts of this case do not call for us to decide whether a prosecutor's single question, the substance of which may have been suggested by an inadmissible extrajudicial statement, necessarily constitutes misconduct or violates a defendant's right of confrontation. Our conclusion here relies on an amalgam of circumstances: the repeated questioning by the prosecutor; his physical reference to Eldred's statement which made it clear his questions included quoted material; and the prosecutor's implied reference to the inadmissible statements in closing argument.

ognize that the statements quoted by the prosecutor were those of Eldred, they were if anything more incriminating as to Blackington because Eldred was describing what Blackington had allegedly told him. As to the statements quoted by the prosecutor, Eldred was in reality no more than a conduit. Blackington, the clear target of the incriminatory inferences to be drawn from the statements, was by virtue of the prosecutor's conduct deprived of his right to confront and cross-examine his accuser, Eldred. If the misconduct was prejudicial as to Eldred, it was doubly prejudicial as to Blackington. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Schneble* v. *Florida* (1972) 405 U.S. 427, 430-432 [31 L.Ed.2d 340, 344-345, 92 S.Ct. 1056].) Accordingly, we reverse.

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

Judgment reversed.

Lewis, J., and Lester, J.,† concurred.

A petition for a rehearing was denied May 30, 1985.

---

*See footnote 1, *ante*, page 1216.
†Assigned by the Chairperson of the Judicial Council.