Filed 5/19/15  P. v. Ugwuzor CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHINASA UGWUZOR,<br><br>    Defendant and Appellant. | B253256<br><br>(Los Angeles County<br>Super. Ct. No. BA407578) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Frederick N. Wapner, Judge.  Affirmed.

Christine Dubois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Chinasa Ugwuzor (Ugwuzor) and his codefendant, Dyranesia Cooper (Dyranesia), were charged with second degree robbery (Pen. Code, § 211). Their trials were severed. Following a jury trial, Ugwuzor was convicted and sentenced to state prison for the midterm of three years. Ugwuzor appeals the judgment on the grounds that the prosecutor committed misconduct and violated his rights to a fair trial and confrontation by (1) asking Dyranesia's father, Gregory Cooper (Cooper), questions suggesting that Dyranesia had confessed to him all the facts concerning the robbery, and (2) telling the jury during closing argument that Cooper could have obtained the information about the robbery only from someone who was present. We find no error and affirm.

**FACTS**

**Prosecution Case**

Surveillance video at a Big 5 Sporting Goods established that Dyranesia purchased a BB gun and ammunition on January 16, 2013, at 2:37 p.m. She was accompanied by Ugwuzor and another male. Ugwuzor was Dyranesia's boyfriend. She provided her identification to make the purchase, paid in cash, and handed Ugwuzor the change.

Between 10:00 p.m. and 10:15 p.m., Jose Aguilar (Aguilar) was walking on the sidewalk on Fairfax Avenue near 3rd Street in Los Angeles, talking on an iPhone 4. He noticed a single car parked on the street. It was a dark green, four-door Chevy,[1] and its emergency lights were flashing. The rear passenger windows appeared to be tinted.

As Aguilar walked past the car, he heard a voice tell him to turn around. When he turned, he saw a man pointing a gun at him. The man was approximately three feet away. He wore a black hoodie, and had a dark cloth covering the lower part of his face. His eyes and the top part of his nose were visible. In particular, his eyes stood out to Aguilar.

Later, Aguilar was shown a six-pack photo display. Ugwuzor's photograph was in position number three. Aguilar wrote that photograph numbers "[t]hree and five show characteristics [similar] to the male that robbed me. The dark complexion and the eyes were all I was able to see due to his head being covered by a hooded sweater and scarf

---

[1]     Cooper bought the Chevy, which was a Malibu, for Dyranesia as a graduation present.

2

covering his mouth and nose." At the preliminary hearing, and also at trial, Aguilar identified Ugwuzor as the robber. Because Ugwuzor's eyes stood out, it was easier for Aguilar to identify Ugwuzor in person than in a photograph.

While Ugwuzor was pointing the gun, he demanded that Aguilar hand over his phone. Aguilar asked if Ugwuzor was serious, which prompted him to repeat his demand. Aguilar said, "Come on," as though pleading. One more time, Ugwuzor repeated his demand. Aguilar handed over the phone.

Ugwuzor went to the green Chevy and got into the front passenger seat. Aguilar saw that the driver of the car was female, and he also saw the car's front license plate. He wrote the license plate number and the words, "Chevy green," on his hand. The car drove away. Aguilar used the telephone at a gas station to call 9-1-1.

On January 17, 2013, in the early morning hours, the police went to the address of the registered owner of the Chevy. Afterwards, Cooper called Ugwuzor. Cooper testified, "I was very upset about the situation because I knew [Ugwuzor and Dyranesia] were together. And all of a sudden, the police come and say my daughter was doing some robberies and stuff; and I'm, like, what's going on[?]" When Cooper told Ugwuzor that Dyranesia had been arrested, Ugwuzor did not seem surprised or alarmed. Ugwuzor said he and Dyranesia had gone to dinner earlier, she dropped him off, and he was at home in bed. At some point, Cooper said he was going to take Ugwuzor to the police station because they were looking for him.

Cooper drove to Ugwuzor's house. He was wearing a suit, and waiting outside. He got into the car, and they drove to the police station. While driving, Cooper asked Ugwuzor "what was going on because . . . [he and Dyranesia] had been together that day and . . . was she in . . . a robbery or something; and he was saying . . . he didn't know nothing about it . . . ." At the police station, Ugwuzor was arrested. At some point, police found a black cloth in the center console of the green Chevy.

After Ugwuzor and Dyranesia were released, they met with Cooper at a restaurant. Cooper confronted Ugwuzor with facts about the robbery, and Ugwuzor did not deny anything.

3

A video retrieved from Ugwuzor's cell phone, which was date- and time-stamped January 16, 2013, at 10:19 p.m., was played for the jury.  On the video, Ugwuzor was heard saying to Dyranesia and a second male, "All right, stop right here.  Stop right here.  Stop right here.  Uh, wait[,] go up, yeah, stop right here.  [¶]  . . .  [¶]  . . .  All right, cool, see you can stay in the car.  I'll be right back.  Let's just see what's up."  A car door was heard opening and closing.  The second male said, "He put the gun in his pocket."  Dyranesia replied, "Phsh!  I know, right."  The second male suggested they rob a pizza man, and Dyranesia said, "[W]e should just call and order by the random spot."  They continued to talk about the logistics of ordering a pizza and robbing the delivery person.

The following colloquy ensued:

"MALE #2:  Let me see that.  Oh, he already turned off the phone?  [¶]  . . .

"[DYRANESIA]:  Whose?

"MALE #2:  The iPhone that he got.

"[DYRANESIA]:  Yeah. . . [.]

"MALE #2:  It's in there, right?

"[DYRANESIA]:  Oh, it's in [t]here.  Yeah, he turned it off already.

"MALE #2:  Let me see it.  [¶]  . . .

"MALE #2:  Oh yeah, it's a 4 too."

The sound of the car door opening and closing could be heard again.  Dyranesia exchanged a few words with Ugwuzor, and then stated, "Oh, me and him was talking about the pizza man."  Dyranesia and the second male recounted some of their conversation on the topic.  And then Ugwuzor said, "Wait, what, tell me the plan."

A text message sent from Ugwuzor's cell phone at 2:33 a.m. read, "This is [Dyranesia's] dad's number, bro.  Call[ed] and checked on me and ask[ed] . . . many questions. . . .  I might need you to have my back.  Say, you know, we were at my [house] and stuff like that."  A response to this message read, "What time did I come over? And make sure you delete this [t]ext right after."

**Defense Case**

Criminalist Randy Zepeda (Zepeda) tested a swab from the cloth found in the center console of Dyranesia's car. He recovered a "mixture DNA profile" from the cloth, with the dominant contributor to the mixture being a female. Ugwuzor was excluded as a contributor. But according to Zepeda, it was possible for a person to wear a scarf over his face and not leave any DNA on the scarf.

## DISCUSSION

Ugwuzor's claim of prosecutorial misconduct is subject to de novo review. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.)

### I. Relevant Proceedings.

In a pretrial colloquy, the prosecutor indicated either two juries or a severance was necessary under *Aranda/Bruton*. (*People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).) Counsel for Ugwuzor and Dyranesia concurred. The trial court ordered a severance, and it indicated that Ugwuzor's case would be tried first.

Subsequently, the prosecutor informed the trial court: "I apprised [defense counsel] . . . that I[] spoke[] to [Cooper] for the first time yesterday. . . . [Cooper] mentioned . . . that . . . [¶] . . . [he met with Ugwuzor] . . . at a restaurant where [he] confronted [Ugwuzor] and basically accused him of putting his daughter in a very . . . untenable position [by] . . . committing these robberies and [said,] I know you did it, and you really need to stop doing this kind of thing[] and . . . straighten up your life. [¶] At which point [Ugwuzor] . . . failed to deny any of those accusations and, in fact, told [Cooper] that he was [going to] get his life together or go into the army." Defense counsel objected that the evidence should be excluded because it constituted late discovery in violation of Penal Code section 1054. The trial court overruled the late discovery objection.

On direct examination, the prosecutor established that Cooper was present on January 17, 2013, when Dyranesia was arrested. The police indicated that she had committed robbery. Cooper was upset with Ugwuzor, believing he was the last person to

5

be with Dyranesia. As a result, Cooper called Ugwuzor to apprise him of the situation. He did not act surprised. Cooper picked up Ugwuzor and drove him to the police station. As they were driving, Cooper asked what was going on, and whether she was in the robbery. Ugwuzor claimed that he did not know anything about it.

The prosecutor asked Cooper, "[S]ometime after . . . your daughter was arrested and you took . . . [Ugwuzor] to . . . the police station, . . . did you have a private conversation with your daughter about her activities in the days and couple weeks preceding . . . the early morning of her arrest?"

The trial court interrupted and said, "Wait. Excuse me. [¶] Since we obviously can't get into the content of this conversation— [¶] . . .what's the relevance of the fact that he had one?"

At sidebar, the prosecutor argued, "I'm laying the foundation for the adoptive admissions that I'm going to elicit from [Cooper]. He learned from his daughter what . . . she and [Ugwuzor] had been doing . . . . And he learned from his daughter what they did on the night of January 16th. [¶] He confronted . . . [Ugwuzor] with . . . that information[,] and . . . [Ugwuzor] . . . failed to deny it. [Cooper] even went as far as to . . . indicate that . . . when they were robbing this young man, . . . [Ugwuzor] was putting his own life and the life of his daughter in danger because they only had a toy gun and you never know what someone else out there could have. [¶] . . . [Ugwuzor] didn't deny having a . . . toy gun, he did not deny having a gun[.] . . . And all he responded to in the face of these allegations was that he was [going to] get his life together and go into the army."

The trial court stated, "Okay. [¶] Ask [Cooper] about the conversation he had with [Ugwuzor], but don't ask him . . . anything about the conversation he had with his daughter, or that he learned from his daughter. . . . It doesn't matter where he got the information. The only thing relevant is the conversation he had with [Ugwuzor], and that's the only thing you can ask him about."

Cooper testified that he told Ugwuzor that he "knew everything that they were doing, and I really didn't want to talk to him; but my daughter wanted us to still be

6

friends 'cause she still had feelings for him. . . . [¶] I told them they could have got killed playing with a toy gun out there trying to rob people . . . ." Ugwuzor did not deny his involvement in any robberies. He said he wanted to "get his life together" and "go to the service." When Cooper told Ugwuzor he "had to get this taken care of before he could go anywhere," Ugwuzor said "[t]hat was right."

During direct examination of Cooper, the prosecutor asked, inter alia, the following questions.

"Q: When you talked to the defendant, did you tell him that you knew he had been robbing people for the last week or two?" Defense counsel objected that the question was leading. The objection was sustained.

"Q: And, in fact, when you told him that you [knew] what he had been doing, did you . . . tell him that you knew he had robbed a single person, or that you knew he had robbed multiple people?" Once again, the trial court sustained an objection that the question was leading.

"Q: When you spoke with him about . . . the fact that you knew what he had been involved in—on January 16th, did you confront him with the fact that during the course of that robbery, he had used what you characterized as a toy gun?" Based on an objection from defense counsel, the trial court disallowed the question on the ground that it was leading.

"Q: When you talked to him about the fact that you knew he had been involved in that robbery on January 16th, did you confront him with . . . some items that you knew he had used during the course of that robbery?" Following this question, there was yet another objection on the ground of leading the witness. This time, the trial court overruled the objection.

"Q: And when you confronted him about your knowledge that he had committed the January 16th, 2013, robbery, . . . did he deny committing that robbery?" Defense counsel objected on the grounds that the question misstated the testimony and was compound. The trial court stated, "[T]he objection is sustained just [because] basically

7

on the grounds of the vagueness of the question about the confrontation. Whatever it was that he specifically said when you confronted him is a conclusion in the question."

"Q: Did you make a statement to the defendant about your knowledge of him being involved in a robbery on January 16th, 2013?" Defense counsel objected that the question assumed facts not in evidence, and lacked foundation. These objections were overruled.

In closing argument, the prosecutor summarized the facts stated by Cooper when he was with Ugwuzor at the restaurant. Then the prosecutor said, "[Cooper ] could only know that information if he was present at the robbery, or he received some information from somebody who was present at the robbery."

## II. No Misconduct; No Constitutional Violation.

Conduct qualifies as prosecutorial misconduct under state law when it involves "'"'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"'" [Citation.]" [Citation.]'" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) A pattern of misconduct by a prosecutor violates the federal Constitution only when the misconduct is so egregious that it infects the trial with such unfairness that the defendant is denied due process. (*Ibid.*)

A prosecutor is not permitted to ask questions that imply the existence of facts which he or she made no effort to prove and had no reason to believe could be proved. (*People v. Blackington* (1985) 167 Cal.App.3d 1216, 1221.) Such questions violate a defendant's Sixth Amendment right to confrontation if the context of the questions have the impact of testimony and result in the defendant being denied his right to challenge the accuracy of an accomplice's confession. (*Id.* at p. 1222, citing *Douglas v. Alabama* (1965) 380 U.S. 415, 419–420.)

According to Ugwuzor, the prosecutor committed misconduct because: (1) she knew she could not prove that Cooper had knowledge of what transpired in the two weeks before the robbery and on January 16, 2013, and that the knowledge came from Dyranesia; and (2) the questions and the prosecutor's summation implied Dyranesia confessed to Cooper.

8

We perceive no misconduct. The questions the prosecutor asked were permitted by the trial court. At no point did the prosecutor ask Cooper the source of his information about the robbery. More importantly, *People v. Capistrano* (2014) 59 Cal.4th 830, 869–870 (*Capistrano*) establishes that Ugwuzor's Sixth Amendment right to confrontation was not violated. In *Capistrano*, the jury heard that a witness had a conversation with someone who had been present at the victim's murder, and later asked the defendant whether it was true he had killed someone with a belt. In rejecting a Sixth Amendment challenge under *Aranda/Bruton*, the court stated: "The testimony implied that [an] unknown person told [the witness] defendant killed someone with a belt. Statements that incriminate by implication, however, are not within the scope of *Bruton*. [Citation.] Moreover, the challenged testimony is reasonably viewed as explaining the basis for [the witness's] questions to defendant and to give context to his responses. Introduction of [the witness's] testimony . . . did not 'pose[] a substantial threat to [defendant's] right to confront the witnesses against him.' [Citation.] Accordingly, his rights were not violated." (*Capistrano*, *supra*, 59 Cal.4th at p. 870.) We find no meaningful distinction between *Capistrano* and Ugwuzor's case.

## III. No Prejudice.

Aguilar's eyewitness identification of Ugwuzor, Ugwuzor's adoptive admissions, the video captured from his phone, the text message from his phone soliciting another person to create an alibi the night of the robbery, and the Big 5 Sporting Goods' video constitute overwhelming evidence of guilt. Even if Ugwuzor was denied due process, we conclude that any constitutional violation was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

All other issues are moot.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                ASHMANN-GERST


We concur:


_____, P. J.
        BOREN


_____, J.
            CHAVEZ


10